ROBERTSON v. BEMIS & VOSBURGH et al.

(District Court, E. D. North Carolina. September 27, 1915.)

No. 360.

1. TRUSTS ☞17, 18—PAROL TRUST—CREATION.

As Statute of Frauds (St. 29 Car. II, c. 3) § 7, requiring all declarations of trust to be evidenced by some instrument in writing, signed by the party to be charged, was not enacted in North Carolina, a parol trust, based on a valuable consideration, and declared at the time the legal title of the land passed to and vested in the grantee, will be enforced in that state.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 15–24; Dec. Dig. ☞17, 18.]

2. TRUSTS ☞44—PAROL TRUST—ESTABLISHMENT—EVIDENCE.

The mere oral declaration of trust is insufficient evidence to establish a parol trust, which is denied, and the chancellor will require evidence of corroborating circumstances.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 66–68; Dec. Dig. ☞44.]

3. TRUSTS ☞21—PAROL TRUST—ESTABLISHMENT.

The terms of an alleged parol trust must be reasonably certain as to the property embraced, the persons in whose behalf it is created, and the nature of the interest they are to receive, or the trust cannot be enforced, for the courts cannot make contracts with parties.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 29, 30; Dec. Dig. ☞21.]

4. EVIDENCE ☞271—PAROL TRUST—ESTABLISHMENT.

Statements by the alleged beneficiary, after the declaration, and out of the hearing of the declarant, are inadmissible to establish an alleged parol trust, although they may be admissible as corroborative or contradictory of his testimony.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1068–1079, 1081–1104; Dec. Dig. ☞271.]

5. TRUSTS ☞44—PAROL TRUST—EVIDENCE—SUFFICIENCY.

In a proceeding to establish a parol trust, evidence *held* insufficient to show its existence.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 66–68; Dec. Dig. ☞44.]

In Equity. Bill by W. W. Robertson, trustee of W. E. and T. G. Trenchard, against Bemis & Vosburgh and others, to attach a parol trust to the legal title to land, and to secure an accounting. Decree for defendants.

H. Stuart Lewis, of Suffolk, Va., Peebles & Harris and Gag & Midyette, all of Jackson, N. C., Mason & Long, of Roanoke Rapids, N. C., and Murray Allen and E. L. Travis, both of Raleigh, N. C., for plaintiff.

Bartlett Roper, Jr., of Petersburg, Va., T. T. Hicks, of Henderson, N. C., and Tasker Polk, of Warrenton, N. C., for defendants.

CONNOR, District Judge. Defendants W. E. & T. G. Trenchard were adjudged bankrupt on March 11, 1911, and plaintiff was duly elected and qualified as trustee. Defendants H. C. Bemis and Bemis

& Vosburgh are residents of the state of Pennsylvania. The other defendants are residents of North Carolina and other states. The plaintiff's bill discloses the following case:

Defendants W. E. & T. G. Trenchard were, at and prior to May 8, 1909, engaged in operating a sawmill at Gumberry, Northampton county, N. C. Defendants Bemis & Vosburgh, residents of Pittsburgh, Pa., were engaged in handling in large quantities lumber of the character cut at Trenchard's Mill, and had been customers of or purchasers from them. On or about May 8, 1909, defendant Nathan M. Palmer, a citizen and resident of Warren county, in said state, was engaged in examining several large tracts of timber land in Warren and Franklin counties, adjacent to Northampton, aggregating 9,600 acres, with a view of securing options from the owners of the lands and timber, in the purchase of which he interested the Trenchards. They, being financially unable to buy, opened a correspondence with defendants Bemis & Vosburgh in regard to purchasing. This correspondence resulted in a visit to Warren county by defendant H. C. Bemis, who, after examining the lands upon which defendant Nathan Palmer had secured, or was then endeavoring to secure, options, agreed to advance the amount necessary to secure the title thereto. Defendant T. G. Trenchard assisted in examining the lands and cruising the timber. Plaintiff alleges:

"That prior to the transmission of the legal title to said timber and lands from the respective grantors of the same to the said H. C. Bemis it was agreed by and between the said Bemis & Vosburgh, W. E. & T. G. Trenchard, and Nathan M. Palmer that the said Bemis & Vosburgh should furnish the money to pay for the same, and the deeds to said property should be made to the said H. C. Bemis, who should hold the title to the said timber and land in trust to secure the enforcement and execution of the following agreement:

"First. It was agreed that, for the purpose of reimbursing Bemis & Vosburgh for the money thus advanced by them, together with interest on same and such expense and trouble as they were put to in raising the same, said Bemis & Vosburgh should first be paid the sum of $5 per acre for all lands sold and $2 per thousand feet for all timber sold or manufactured up to 60,000,000 feet.

"Second. It was agreed that all of the net proceeds of the sale of said timber over and above $5 per acre, and all of the net proceeds of the sale of said timber over and above $2 per thousand feet, up to 60,000,000 feet, should be divided as follows: The said Nathan M. Palmer was to receive in full for his services 25 per cent. of the net profits on the sale of any land sold, with timber excepted over and above the aforesaid $5 per acre, to be paid to Bemis & Vosburgh, as aforesaid, and to further receive 5 cents per thousand feet on all timber cut and sold and 10 per cent. of net yearly income from rents of said land as long as he superintended said land.

"Third. The said W. E. & T. G. Trenchard were to receive three-eighths of the net profits from the sale of the land and the rents thereon, after first allowing Bemis & Vosburgh $5 per acre for all land sold, as aforesaid, and were then to receive three-eighths of the net profits of all timber sold, whether sold on the stump or as manufactured lumber, either rough or dressed, after first allowing Bemis & Vosburgh $2 per thousand feet up to 60,000,000 feet as aforesaid. The balance of all net profits, after providing for Palmer and Trenchard, as above mentioned, was to belong to Bemis & Vosburgh."

That, pursuant to this agreement, defendant H. C. Bemis took title to the land, upon which defendant Palmer had taken options. That

thereafter he sold parts of the land and timber to his codefendants Nathan M. Palmer and F. O. Kress Box Company for amounts largely in excess of the price paid therefor, and realized large sums of money as profits thereon. That he has failed and refused to account for and pay over to plaintiff, who succeeded to the rights of W. E. & T. G. Trenchard, in and to said lands and timber, although demand therefor has been made upon him.

Plaintiff further alleges that on July 22, 1910, defendants W. E. & T. G. Trenchard, in consideration of the sum of $500, executed a paper writing purporting to be a release of all their claims in and to said land and timber. That said paper writing was not, in fact, a receipt or release in full of all services rendered to the said H. C. Bemis by said Trenchard in the location and purchase of said lands, and did not operate as a release of their rights under the contract made with said Bemis, and was not so intended by either of the parties thereto; but that said paper was executed for the sole purpose of covering up assets of said Trenchards, and to prevent the property from becoming involved in their liabilities, and to prevent their creditors from realizing any benefit therefrom, and that said release was a fraud on the creditors of said W. E. & T. G. Trenchard. That, after the execution of said release, Bemis & Vosburgh recognized the right of said Trenchards in said agreement or contract. He alleges that W. E. & T. G. Trenchard failed to include in their schedules filed in the proceeding in bankruptcy their interest in said land and timber and the proceeds thereof. That since the adjudication in bankruptcy defendants Bemis & Vosburgh have wrongfully and unlawfully paid to defendants W. E. & T. G. Trenchard the sum of $4,500 in part payment of their interest in said land and timber.

Plaintiff prays that defendant H. C. Bemis be adjudged to hold the proceeds of the land and timber in trust for his benefit in accordance with the terms of said agreement; that he account for the money received from sales thereof; that the release executed by W. E. & T. G. Trenchard, July 22, 1910, be declared void, etc.; that the other defendants be enjoined from paying to H. C. Bemis any sums due him on account of sales made to them of said lands and timber.

Defendants H. C. Bemis and Bemis & Vosburgh, for answer to plaintiff's bill, say: That prior to the spring of the year 1909 they had been customers of the Trenchards and knew them to be skilled manufacturers of lumber. That, without their knowledge, said Trenchards had inspected timber lands in Warren and Franklin counties, upon which defendant Nathan M. Palmer had secured, or was endeavoring to secure, options. That they suggested to defendant H. C. Bemis the purchase of the timber. At this time defendants W. E. & T. G. Trenchard had only a small quantity of timber uncut, convenient to their mill at Gumberry, and desired defendant H. C. Bemis to purchase the timber, upon which defendant had taken or was securing options, hoping and expecting that they would be able to make arrangement with him by which they would be enabled to cut the timber. That in consequence of the correspondence and interviews between them defendant H. C. Bemis, together with defendants T. G. Trenchard and Nathan

M. Palmer, went over and made an estimate of the quantity thereof. Defendant H. C. Bemis, after making the examination, decided to purchase the lands and timber for his firm. Title was taken to him, the firm advancing the money to pay the purchase price, without any contract, oral or written, with defendants W. E. & T. G. Trenchard. It was understood, however, that when the said Bemis & Vosburgh, who were the real owners of the lands, wished to have the standing timber thereon manufactured into lumber, if at that time the bankrupts were in such financial condition that they could build the necessary railroad and manufacture said timber, they were to have the right to manufacture same on such terms as might be agreed upon. No definite terms were ever agreed upon, and no agreement, either oral or written, was made with them for manufacturing said timber. It was understood that, if the Trenchards manufactured the timber, they were to build the necessary railroads on said land, whereby the value of the lands denuded of the timber would be increased, said Trenchards should receive, on the sale of the denuded lands, one-half of the price gotten therefor, in excess of $5 per acre, and the commission due the agent Nathan M. Palmer. No contract was made or entered into with them for the manufacture of the timber, and no railroad was built on said land by the Trenchards. Before any definite arrangement or agreement of any kind was made, or had, between Bemis & Vosburgh and W. E. & T. G. Trenchard, the latter were adjudged bankrupts.

In regard to the payment of $500 and the execution of the release, they say that, while the Trenchards had no interest in the land or timber, or legal claim against defendants Bemis & Vosburgh, or H. C. Bemis, they wished to pay them a fair price for their services in going over and making an examination of the standing timber, and the sum paid was considered a fair price for said services. In respect to the alleged payment to W. E. & T. G. Trenchard, defendants say: That they (the Trenchards) after their adjudication in bankruptcy, sought other lumber business in South Carolina and applied to them for financial help. They needed money with which to purchase standing timber. That they felt kindly to said Trenchards and desired to help them. Defendant H. C. Bemis loaned them $4,500 for the purpose of helping them, and took their note therefor. They deny that said loan was made to satisfy, or in payment of, any legal or binding claim against them. Defendant T. G. Trenchard's answer is substantially the same as Bemis & Vosburgh's. W. E. Trenchard did not file an answer. Defendant Nathan M. Palmer answers, denying that there was any such contract as alleged by plaintiff. The pleadings are verified.

The cause was heard upon the oral testimony of the parties and their witnesses, and exhibits. For the purpose of proving the contract set out in his bill, plaintiff introduced W. F. Dent, who testified: That during the year 1909, and for several years prior thereto, and until they were adjudged bankrupts, he was in the employment of defendants W. E. & T. G. Trenchard, at Cumberry, N. C., as bookkeeper and general office man. That he heard the conversation between T. G. Trenchard and H. C. Bemis in regard to the property in controversy. He says:

"On the day this contract was signed by Mr. Palmer, they discussed the matter in my presence, and Mr. Palmer's interest in the matter was fixed, and the contract was drawn up and signed then. I was present when he signed it. The land was to be fixed at $5 per acre, and that it was to be put on the market and sold, and Mr. Palmer was to handle the sale of it, and he was to get two-eighths of the net proceeds, that is, all over $8 per acre, reserving the timber; the Trenchards were to get three-eighths and Bemis & Vosburgh three-eighths of all over $5 per acre, and as to the standing timber the value of it was fixed on the stump at $2 per thousand, and Mr. Palmer was to receive, as his share 5 cents per thousand and W. E. & T. G. Trenchard were to receive one-half of the profits in that timber. The net profits would be all over the cost of the manufacture, carrying it to the mill, or they were to carry the mill to the timber, but they had gone so far as to get rate from the Seaboard Air Line, which was $2 per thousand; they were to get commission for selling the manufactured product, usually 5 per cent."

To the question:

"What was the agreement in respect to division in case the timber was sold, instead of manufactured?"

—he answered:

"I cannot say that any positive agreement existed as to that. The Trench-ards' object was to get some timber behind this mill. Q. Was there any further agreement about that? A. I cannot say that there was. It was not fixed as to how the timber was to be sold. * * * Nothing was said about dividing the profits in case the timber was sold, not manufactured."

The contract between the defendants Bemis & Vosburgh and W. E. & T. G. Trenchard and Nathan M. Palmer, referred to by the witness, was executed on the 8th day of October, 1909—setting forth the compensation which Palmer was to receive for his services in acquiring the options, superintending and disposing of all, or part, of the land, and collecting the rents. Plaintiff introduced other evidence for the purpose of corroborating the testimony of this witness. It will be hereafter noted.

Defendants introduced Nathan M. Palmer, who testified that he was endeavoring to secure options on several tracts of land in Warren county. He mentioned the matter to defendant T. G. Trenchard, who said that he thought that he could interest other parties—understood that he referred to H. C. Bemis. At the time he closed the matter with H. C. Bemis, he did not recognize the Trenchards as purchasers of the timber. At that time they expected to manufacture the timber; had no agreement with them in regard to payment of compensation; looked to H. C. Bemis as the author of the contract. Nothing was done by the Trenchards towards the manufacture of the timber, or the building of the railroad. He further says that he has always paid the rents to Bemis since October, 1910; never paid any money to the Trenchards on account of rents. Upon cross-examination, Mr. Palmer is asked whether he knows what arrangements were made between Bemis and the Trenchards, "when they first went into this transaction," to which he answered:

"Yes; I can say that I know that they were expected to manufacture that timber and run the railroad, and they got in financial trouble and could not do so."

Mr. T. G. Trenchard was trying to help witness carry through the deal. He went over the land and estimated the timber; was up there several times. Neither of the Trenchards ever demanded of, or received from, the witness one cent of the income from the land.

H. C. Bemis testified that after some correspondence, which was introduced, defendant T. G. Trenchard came to Pittsburgh; wanted to know if witness would be interested in the purchase of the timber. He said that he (witness) was anxious to get a good supply of stock in North Carolina. He would go down and look the property over with Mr. Palmer and Mr. Tom Trenchard. After looking it over, he decided that he would make an effort to purchase it. He says:

"I gave Mr. Trenchard this understanding in regard to it: I said: 'I will buy this if we can raise the money to buy the timber and the land. I want to have you manufacture the timber, build the railroad, and go over all that part of the business.' I said: 'If we can arrange to do [so], without a partnership, I want you to have some interest in this proposition.' I said: 'I will keep title to the land and the timber. I want to make this proposition interesting to you, as well as to Bemis & Vosburgh, and those who are interested in Bemis & Vosburgh, and I think we can arrange it in some way so that we can get at a division of the profits.' As far as the timber was concerned, I figured that we should get about $4. I supposed that it was worth that much. There was never any price set; there was no definite arrangement made; the only arrangement we talked over was with regard to the land, when I made this contract with Mr. Palmer. When Mr. Palmer was there, I had him come over to Trenchard's office, and there was a thorough understanding between us, and I said: 'Trenchard, I would like for you to sign this little memorandum. I want to know just what Mr. Palmer is to get.' I said: 'I would like for you to sign this, because I expect you will share in the increased valuation of this property by the building of that railroad.' I said: 'My intention later on is to draw over the contract. I want to make it so that you can make a good thing out of the manufacturing.' And we never had any definite arrangement; positively, we never had any."

He says that his plan was for them to build the railroad at their own expense; he was to put the money in the land and the timber. The reason the Trenchards did not manufacture the timber was because they were not financially able to go ahead.

Defendant T. G. Trenchard testified:

That Nathan M. Palmer wrote him that he had some good timber land in Warren county that he could get an option on, and wished to know if he (witness) could get some one with money who could put it up. Witness said that he would try. That he tried several, and finally Bemis & Vosburgh. H. C. Bemis agreed to pay the money and take the land and timber. "There was never any definite understanding about it, either written or oral. There was this much said by Mr. Bemis to us: 'You have a plant and are equipped to manufacture lumber. Bemis & Vosburgh want a North Carolina connection. Bemis & Vosburgh are putting up the money to buy this land, and it is a good combination, and if you will put in a railroad, lay the ties, and bring it to the mill, and manufacture it well, we think we can all make some money out of it, and I am going to see that you are treated right.' I had absolute confidence in him. I had a classmate in college who knew him well. I had every reason to rely upon him. It was the last hope we had of continuing business, to get the timber at our mill. We had cut everything, even as far as Roanoke Rapids. This was our last straw to catch at."

He further testified: That he was present when the agreement with Mr. Palmer was made. It was signed by W. E. and T. G. Trenchard.

That it was his understanding that Bemis wanted them to sign to show their understanding of the contract with Palmer, so that, if they did manufacture the lumber, that would be settled. That he did not think they had any legal interest· in the property at the time they signed it. They never demanded any return or rent from Mr. Palmer. Upon cross-examination he says:

That at the time the land was bought they had an agreement with Bemis & Vosburgh that they were to share in the profits on the land, if they manufactured the lumber. Bemis was to furnish the money to buy the timber, and they (the Trenchards) were to manufacture it. This was never reduced to writing. "It was just a general understanding; that is, if we put the railroad [in], logged the timber, and manufactured it, and if we did those things, we got a share of the profits."

Defendant W. E. Trenchard was not examined. Plaintiff introduced a letter written by him to Mr. S. M. Price, bearing date March 1, 1915, in which he, at the request of Mr. Price, a creditor of W. E. & T. G. Trenchard, undertakes to give his version of the matter. Among other things he writes:

"In reference to the land, Mr. H. C. Bemis explained to T. G. Trenchard that his reason for giving us originally an interest in the land was because we were to have built a railroad into the timber, and, as this would have increased the value of the land, he thought we should receive a part of the profits as we did not build the railroad. He thus considered we had again failed to carry out our part of the contract, and he was, therefore, released from giving us any profit."

A second letter to Mr. Price from W. E. Trenchard is introduced, in which he says that he sent Mr. Bemis a copy of his first letter, and that he (Bemis) had called his (Trenchard's) attention to the fact that there was an agreement made with Palmer, which W. E. & T. G. Trenchard signed, but that there was not any agreement as to any interest in this land as between Bemis and the Trenchards, and that since thinking it over he is sure Mr. Bemis is right, but, as he has already stated, any agreements which are in existence will show for themselves—that he feels that he has made a mistake in his first letter.

[1] The foregoing is the substance and in essential respects the exact language of the witnesses who testify directly in regard to the contract, all of whom, it is conceded, were present when Mr. Dent testifies that the contract was made and its terms fixed. There is an irreconcilable difference between the testimony of the witnesses in regard to an essential element in the transaction. Before proceeding to consider the testimony relied upon by each of the parties to sustain or corroborate their contentions, it may be well to settle certain principles or rules by which the chancellor, in equity, is guided when he is asked to attach to, or fix a parol trust upon, the legal title to land. It is well settled in this state that, if it is shown by competent testimony that at the time the legal title to land passes to and vests in the grantee, a trust in behalf of a third person, based upon a valuable consideration, is declared in parol, the terms of which are definite, the court will enforce it. This doctrine is based upon the fact that the seventh section of the statute of frauds (St. 29 Car. II), requiring all declarations of trust to be manifested or proved by some writing signed by

the party to be charged therewith, has not been enacted in this state. Shelton v. Shelton, 58 N. C. 292. In Riggs v. Swann, 59 N. C. 118, Chief Justice Pearson says:

"The objection that the declaration of trust was not in writing, and was therefore void, is not tenable. There is in this state no statute which requires the declaration of a trust, made at the time the legal title passes to one, who agrees to hold in trust," accompanying the transmission of the legal title, "shall be in writing."

This decision has been frequently cited with approval by the Supreme Court of this state. Ferguson v. Haas, 64 N. C. 773; Frey v. Ramsour, 66 N. C. 466; Smiley v. Pearce, 98 N. C. 185, 3 S. E. 631; Sykes v. Boone, 132 N. C. 199, 43 S. E. 645, 95 Am. St. Rep. 619; Avery v. Stewart, 136 N. C. 426, 48 S. E. 775, 68 L. R. A. 776; Gaylord v. Gaylord, 150 N. C. 222, 237, 63 S. E. 1028.

[2-5] While this was so held, the chancellors, for their own guidance, held that, when the alleged declaration of trust was denied, they would require proof of facts and circumstances aliunde the alleged declaration. It must be conceded that language has been used in some of the opinions which is not easily reconcilable with this doctrine. This is especially true since the adoption of the Constitution of 1868, in which the distinction between actions at law and suits in equity is abolished, and suits to declare parol trust are now tried before juries. Without undertaking to reconcile the more or less variant expressions found in opinions in the reported cases in this state, it is deemed a wise and safe rule, for the guidance of the judge in fixing the probative value of the testimony, to look for corroborative facts and circumstances to sustain the plaintiff's allegation. As said by Mr. Justice Rodman, in Ferguson v. Haas, supra:

"It is hard to conceive of a case which could be founded on words only, without some corroborating facts and circumstances."

When it is shown that the person, in whose behalf it is alleged the trust was declared, paid the consideration upon which the title passed, the court finds but little difficulty in attaching the trust. It is sometimes said that, in such cases, a resulting trust, in favor of the party paying the consideration, is implied. When the grantee does not take possession, and permits the person alleging the declaration of trust to do so, and retain possession, paying no rent, a trust will be attached; this conduct being consistent with the allegation that the holder of the legal title was not the beneficial owner. The testimony in this case shows that Bemis & Vosburgh paid every dollar of the consideration, about $135,000. H. C. Bemis took possession, by his agent, Mr. Palmer, and received the rents and profits. When we seek for facts, circumstances, or conduct on the part of H. C. Bemis, inconsistent with absolute ownership, conduct on the part of the Trenchards consistent with the claim asserted by the plaintiff, we find two circumstances relied upon by him. These will be carefully considered.

Before referring to the execution of the receipt of July 22, 1910, and the loan of $4,500 February 8, 1912, it will be well to examine the correspondence between Bemis and the Trenchards, prior to the execution of the contract with defendant Palmer, October 8, 1909.

Trenchard writes Bemis & Vosburgh, May 8, 1909, that they are offered a tract of land, that "the proposition looks good to us, and we want to arrange to finance it"—asking for a conference. On May 13th they write that they will meet Bemis & Vosburgh in Pittsburgh; that "the proposition looks very attractive"; that they understand that they (Bemis & Vosburgh) would like to have Mr. Bemis become interested in Southern pine timber; that they think this a favorable opportunity to present a proposition that will pan out well. Later on they write, sending a description of the lands:

"We are satisfied that a satisfactory arrangement of this can be worked out. * * * We could cut this in about five years, and, by paying back at the rate of $2,500 a month, the timber could be paid for about as cut."

On February 20, 1910, they write:

"We would want to cut only enough to run the mill while we were getting the log road into the timber further on, as it is larger and gives the smaller timber near the railroad a chance to grow. * * * It looks now as if we would have to go into this timber some time in April, unless we can get more than we at present expect to get where we are now cutting, so we would hope to have as little delay as possible."

March 1, 1910:

"We will be ready to leave the territory of our present logging operations about the middle of April, and when we finish where we are at present logging it will take from a month to six weeks for us to move track and equipment from here and put down some in Warren County timber, and, in addition to this, the Seaboard is always slow in putting down the sidings. * * * We are especially anxious to have everything in shape for a quick move, when the time comes to transfer our logging outfit, as delay shuts down the sawmill and causes serious loss to us." •

April 18, 1910, H. C. Bemis writes Trenchard:

"You did not state, in either letter, which route you considered preferable for a railroad. * * * I am glad to note that you have secured some more timber, so that you can keep your mill running a month or two longer."

On May 10, 1910, Bemis & Vosburgh write Mr. Palmer:

"We suggested to Mr. Pugh that, possibly, the Trenchards' railroad could be extended a few miles so as to reach their timber," etc.

It is manifest, from these extracts, that it was expected that the Trenchards were to build a railroad to the timber, and that they were running short of other timber. I do not find any language in the correspondence indicating that they were to have any interest in or relation to the timber, unless they built the railroad. This explains why they were anxious that Bemis & Vosburgh should buy and control this large body of land and timber, and corroborates the testimony of Bemis, Palmer, and Trenchard. Mr. Dent, who says that they were to share in the profits of the sale of the land and timber, without regard to building a railroad and manufacturing the lumber, also says that he cannot say that any positive agreement was made in regard to division—

"in case timber was sold instead of manufactured. It was not fixed as to how the timber was to be sold. W. E. & T. G. Trenchard were to build the railroad. The railroad was to go from Littleton. * * * Nothing was said about dividing the profits in case the timber was sold, not manufactured."

In his letter to Mr. Robertson, February 5, 1913, in which he undertakes to state the whole transaction, and begins by saying, "These people are lying, or I am mistaken," he says, among other things:

"They wanted a purchaser who would buy this timber for W. E. & T. G. Trenchard, that they may have a good supply of timber back of their mill, or, if this could not be done, they hoped to make a sale of these timber lands for whatever profit or commission there may have been in it for them and Mr. Palmer: but the real object of the sale of the timber was to put a supply behind the Gumberry mill, it mattered not who bought the timber. * * * The Trenchards were not to construct any railroad whatever, unless it was needed for the logging operations. * * * The fact that the railroad was not built and the timber not manufactured was no fault of the Trenchards, but they were always ready, willing, and anxious to begin operations there, and, if Bemis & Vosburgh had allowed them to go ahead, it might not have been necessary for them to have gone into bankruptcy. The Trenchards thought all the time that they were to be called upon to begin operations there at any time, and I thought so too, until they were advised by Mr. Bemis, the elder, that they must first fail and get rid of their creditors."

Mr. Dent is contradicted in this statement, or inference, by the letter from the Trenchards to Bemis & Vosburgh, of June 24, 1910, in which they say that, unless some steps are taken immediately to obtain money for their running expenses and relieve them from the pressure of their creditors, they would be compelled to cease operations at once. Although it is in evidence that they were on the verge of, and as it turned out were forced into, bankruptcy by other creditors, and appealing to Bemis & Vosburgh for assistance, they make no suggestion that they had any interest in the lands and timber in controversy. In the reply to this letter, Bemis & Vosburgh ask them to try to continue operations for a short time and make a statement of their business, with a view to extending aid. There is no suggestion that they should fail. Nothing is found to sustain Mr. Dent's charge that they were endeavoring to devise a plan to aid the Trenchards to defraud their creditors, or that the Trenchards had any purpose to defraud their creditors. If, as testified by Mr. Dent, the terms of the contract between Bemis and the Trenchards were agreed upon at the time the agreement with Palmer was signed, October 8, 1910, it is difficult to understand why they did not then and there reduce them to writing. No explanation is suggested by Mr. Dent. It is manifest that Mr. Bemis desired to have the terms of the contract with Mr. Palmer fixed. He says that at that time no definite terms had been agreed upon with the Trenchards, and in this he is corroborated by them and by Mr. Palmer; also by the reason which he gives, that no definite terms had been fixed.

It is conceded by every witness, sustained by the written evidence, and by every circumstance, that the Trenchards were unable, by reason of financial embarrassment, to build the railroad. There is not a scintilla of evidence that Bemis & Vosburgh refused to allow them, or prevented them from doing so. Mr. Dent is unfortunate in making, unnecessarily, an issue of veracity with every other witness who has testified in this case, in that the correspondence between the parties contradicts him and corroborates them. In his letter, four pages of closely written typewriting, he excludes any suggestion that differences

between the other parties and himself may be accounted for by differences of understanding or memory, but insists that they are "either lying" or he "is mistaken." It is difficult to separate those matters in respect to which he is "absolutely positive" from those in which he is giving his conclusion or inference. He says that he dictated the letter and did not read it over. He concedes that, if there are any mistakes in it, they are to be attributed to "my mistake or the stenographer's mistake." Difficulty would be found in deducing from his testimony, and his letter, the terms of a contract sufficiently definite to enable a court to declare a parol trust.

"The declaration of trust, whether written or oral, must be reasonably certain in its material terms; and this requisite of certainty includes the subject-matter or property embraced within the trust, the beneficiaries, or persons in whose behalf it is created, the nature and quantity of interests which they are to have, and the manner in which the trust is to be performed. If the language is so vague, general, or equivocal that any of these necessary elements are left in real uncertainty, then the trust must fail." 2 Pomeroy, Eq. 1009.

The court cannot make a contract for the parties. It can only enforce one made by themselves, the terms of which are clear and definite. The plaintiff relies upon declarations made by defendant T. G. Trenchard to his creditors, in regard to which several witnesses have testified. While I have given to this evidence careful consideration, in weighing the testimony of Mr. Trenchard, it is clear that such declarations, made subsequent to the time the alleged contract was made, are not competent to be considered as substantive evidence against defendants H. C. Bemis and Bemis & Vosburgh. They are only competent to be considered as affecting the credibility of Trenchard, to contradict his testimony. It is due him to say that they were made when he was endeavoring to satisfy the demands of his creditors, and when carefully examined are not, in any essential respects, contradictory of his testimony. However this may be, it is clear that a liability cannot be fixed upon defendant H. C. Bemis by declarations made by T. G. Trenchard in his absence, and of which he had no knowledge.

Plaintiff insists that Mr. Dent's testimony and his contention is sustained by reference to the transaction of July 22, 1910. The evidence bearing on this transaction comes from Mr. Tasker Polk and Mr. W. W. Vosburgh. Mr. Polk is a practicing attorney of unquestioned integrity, residing in Warren county. He was employed to examine the title, and draw the deeds for the lands purchased by H. C. Bemis. He says that Mr. W. W. Vosburgh and Mr. Palmer came to his office and showed him the contract between them of October 8, 1909, and explained the situation and the relation which W. E. & T. G. Trenchard bore to the property; and they said that they were to build a railroad, cut the timber, and share some of the profits. He advised them not to go into a contract of that kind—to pay them some money for whatever interest they had and "cut loose from them, and that was about all that was said." He drew the receipt, drew all of the deeds, attended to all of the business, and never knew that they had any interest in the land. Mr. Polk's testimony excludes the suggestion that

the receipt was drawn with any purpose of withdrawing the interest of the Trenchards from their creditors. His advice was perfectly proper and wise. It is, in all respects, corroborated by Mr. W. W. Vosburgh and Mr. Palmer. He says that the money was paid to compensate them for their services.

It is insisted that what occurred between Bemis & Vosburgh and the Trenchards, before it was executed, shows that, while in form it was a full receipt for, and release of, any claim or interest of the Trenchards, it was not intended by either party to operate as a full release. This contention is based upon the correspondence between them before the paper was signed. Neither of the Trenchards were present when Mr. Polk drew the receipt. When sent, with the offer to pay them $500 in satisfaction of any contingent claim they might have, they wrote Bemis & Vosburgh, asking for an explanation of their purpose, saying:

"We somehow feel that your idea is to protect both you and ourselves during our present financial difficulties."

To this they wired, "Release is for our protection," whereupon they executed the receipt and received the $500. This was some seven months prior to the adjudication of the Trenchards as bankrupts. If it were conceded that they had any legal or equitable right in the property prior to this time, it would be difficult to find in this evidence sufficient basis for canceling the receipt upon the suggestion that it was intended to defraud their creditors. They had a right to release any interest or claim which they had for such consideration as was agreed upon. Bemis & Vosburgh, acting under the advice of their counsel, wished to have a release of any possible claim which the Trenchards might set up, and were willing to pay $500 to secure it. The right of the Trenchards was really of no value. They were unable to build the railroad and manufacture the lumber; this being their only claim upon Bemis. They had rendered some service in bringing the parties together and examining the timber.

It appears, from the evidence, that the Trenchards, after being adjudged bankrupt, went to South Carolina and endeavored to engage in purchasing timber. Mr. Bemis says:

That they wrote him that if they could get some help they had an opportunity to make some money in South Carolina; that he met T. G. Trenchard in Washington. "I was interested to see them do as well as they could, and get themselves on their feet, and I said: 'Tom, I have always intended to do something for you on account of this opportunity that you lost in Warren county. You intended to go in there and make some money, but circumstances fixed it so that you could not go ahead.' And I told him that I was going to help him out. I said that I was hard up for money, but would give notes. They said they felt that they had a purchaser that would buy at a nice profit, and I thought that it was a good chance to help them out. I felt under a moral obligation to help them."

He sent them his notes for $4,500, which they discounted, and gave him their note for the amount. The timber contract fell through, and the note has not been paid. The letter of February 8, 1912, inclosing the notes, corroborates this testimony. The only suggestion that there was any fraud in this transaction comes from Mr. Dent, who says that

he saw a letter from Mr. J. W. Bemis, written from Florida, in which he said, in substance, that:

"We have decided to let you have this money, but, until you get your affairs straightened up, we had just better consider it as a loan instead of a payment."

Trenchard denies ever receiving any such letter from Mr. J. W. Bemis, who is 80 years of age and does not appear to have had any personal connection with any of the transactions with the Trenchards. It is evident, both from Mr. Dent's testimony and the letter written plaintiff, that for some reason he is very hostile to defendants. Without making any reflection on his credibility, his testimony, in many respects, is colored by his feelings. The testimony of Mr. H. C. Bemis and T. G. Trenchard, and their bearing on the witness stand, is frank and candid. Bemis concedes that, if the notes for the balance due on sales of the land and timber are collected, he will make a profit out of the transaction of some $80,000. He invested $135,000 five years ago. It was unfortunate for the Trenchards and their creditors that they were unable to build the railroad and manufacture the lumber. They would doubtless have made a profit and been able to meet their obligations. Their failure to do so cannot be charged to any breach of obligation on the part of H. C. Bemis, or Bemis & Vosburgh.

Upon a careful consideration of all of the evidence, I am of the opinion that the plaintiff is not entitled to a decree. The cost will be taxed against the plaintiff, and a decree signed, dismissing the bill.